**HALL, Appellant,**

v.

**CFIC HOME MORTGAGE et al., Appellees.**

[Cite as *Hall v. CFIC Home Mtg.,* 175 Ohio App.3d 587, 2008-Ohio-1016.]

Court of Appeals of Ohio,
Twelfth District, Butler County.

No. CA2007–03–054.

Decided March 10, 2008.

Richard L. Hurchanik, for appellant.

Crabbe, Brown & James L.L.P., Brian E. Hurley, Robert J. Gehring, and Beth Wayne, for appellee Jill Woodyard.

Flagel & Papakirk L.L.C., James Papakirk, for appellees, Patty Burke, a.k.a. Patty Helton, PSC Services, & Patty's Closing Service.

---

Young, Presiding Judge.

{¶ 1} Plaintiff-appellant, Sharon Hall, appeals a decision of the Butler County Court of Common Pleas granting summary judgment in favor of defendants-appellees, Jill Woodyard and Patty Burke. We affirm the decision of the trial court in part and reverse in part.

{¶ 2} This case is the result of an alleged unauthorized credit check performed by Jill Woodyard while working at CFIC Home Mortgage on behalf of Patty; however, the case is only one matter in a series of contentious events involving a divorced couple and their new spouses.

{¶ 3} In May 2004, Sharon Hall divorced Donovan Burke. During their marriage, the couple had two children. Under the decree of divorce, Sharon was granted possession of the marital residence and was required to "assume any outstanding mortgage(s) on said real estate, holding [Donovan Burke] harmless from any payment thereon." Shortly after the divorce, Donovan Burke married Patty Burke, while Sharon married Steven Hall. By all accounts, the interaction between the new couples was anything but cordial.

{¶ 4} On January 19, 2005, Sharon telephoned the Burke residence after one of the children informed Sharon that Patty referred to her as "stupid." Sharon told Donovan that she did not appreciate "Patty and Don degrading her to her children." Donovan denied making any disparaging remarks about the Halls, and the call ended. Patty immediately called the Hall residence, requesting to talk to the children about the alleged remark. After speaking with the children, Patty and Sharon had a discussion. According to Sharon, Patty asked her why she had not refinanced the home and removed Donovan from the mortgage. Sharon replied that her credit was bad due to the divorce. According to Sharon, Patty allegedly challenged this excuse by admitting that she knew Sharon's credit score and stated that it was "not that bad, it is 600." Further, Patty allegedly informed Sharon of other information that appears to have been gleaned from a credit report and of a debt that was not included on Sharon's report. Sharon then inquired from Patty what other information she knew from the credit report. Steven Hall was allegedly on another phone in the house listening to the exchange and stated to Patty that it was a violation of federal law to pull someone's credit report. Patty then allegedly became quiet and made no further statements about Sharon's credit. Patty denied mentioning Sharon's credit score and the other credit information during the conversation.

{¶ 5} As a result, Sharon decided to investigate how Patty had obtained information about her creditworthiness. The following day, Sharon obtained a copy of her credit report via the Internet. She discovered that Equidata evaluated and reported her credit as a result of an inquiry made for a potential real-estate loan. Sharon called Equidata and discovered that CFIC Home Mortgage had made the inquiry on December 6, 2004.

{¶ 6} Sharon called CFIC, and the call was forwarded to appellee Jill Woodyard. Jill asked if Sharon knew R.J. Ball, stating that R.J. works at CFIC and may have pulled the credit by error. Jill then indicated that she would check into the matter and get back to Sharon. In the interim, Sharon discovered that Jill

had notarized a land contract for the Burkes. Further, Sharon's 12–year–old daughter purportedly reported that she had witnessed Jill with Patty on multiple occasions and she was present at the Burke's home multiple times when Jill had been over to their house.

{¶ 7} Sharon again called Jill to confront her with this information. Jill initially denied knowing the Burkes. However, according to Jill, after clearing up some confusion regarding Patty's name change as a result of her marriage, Jill affirmed that she knew Patty because she had transacted business with her through CFIC. Patty operated PCS Services and Patty's Closing Services, frequently conducting mortgage closings for CFIC.

{¶ 8} Jill thereafter informed Sharon that her name was submitted to CFIC on a lead sheet dated November 25, 2004, supplied by Patty to loan officer Ron Ball. This lead sheet was a handwritten sheet of paper identifying three individuals who were potentially interested in mortgage services from CFIC. Sharon's name and information were listed at the top of the sheet with the information of two other individuals. The other names on the lead sheet were Sharon Lawrence and Gail Taylor. Jill stated that the second lead, Sharon Lawrence, had expressed an interest in applying for a new mortgage loan and Ball instructed her to "do a full application" which included pulling a credit report. Jill claimed that she confused Sharon Hall with Sharon Lawrence since they share the same first name and inadvertently pulled Sharon Hall's credit report. Further, Jill stated that she did not download Sharon's credit report and closed the inquiry upon realizing her mistake.

{¶ 9} Sharon did not believe Jill's explanation and filed the instant action, alleging multiple claims against CFIC, Patty, Jill Woodyard, PCS Services, and Patty's Closing Services.

{¶ 10} Additional investigation and discovery was conducted. Sharon submitted an affidavit of Stephanie Kief. Kief stated that she was present with Patty while Patty was on the telephone talking to a person she referred to as Jill. According to Kief, Patty and Jill were discussing how to conceal the fact that they had accessed Sharon's credit report. Kief further stated that Patty informed her that she had Jill access Sharon's credit for her as a favor.

{¶ 11} Sharon also submitted affidavits from Gail Taylor and Sharon and David Lawrence, the other individuals identified on the lead sheet. Gail Taylor stated that she does not know either Patty or Jill, the telephone number and social security number listed on the sheet does not belong to her, and she knew of no reason for CFIC or "a Patty to run a credit check on me in November 2004."

{¶ 12} The Lawrences stated that they never dealt with Patty Burke, R.J. Ball, or anyone from CFIC on or about November 25, 2004, and the social security

number listed on the sheet is not theirs. Further, the Lawrences stated that the lead sheet "appears to claim we spoke with someone on 12-1-04 regarding credit and we requested something that required a 'full [application].' On or about 12-1-04 we did not request a loan or anything that required a loan application, credit check nor did we speak with anyone regarding these items."

{¶ 13} On April 10, 2006, Jill filed a motion for summary judgment. On May 4, 2006, Sharon filed a motion for leave to amend the complaint to enlarge the alleged conspiracy claims under Ohio's Racketeer Influenced and Corrupt Organizations ("RICO") statute, R.C. 2923.31 et seq. On May 8, 2006, Patty filed a motion for summary judgment.

{¶ 14} On November 3, 2006, Sharon moved for a decision on the motions for summary judgment. On January 10, 2007, an agreed order of dismissal was filed with the trial court stating that Sharon and CFIC had entered into a settlement and CFIC was dismissed from the suit. Thereafter, on February 12, 2007, the trial court granted summary judgment in favor of appellees in separate opinions. The trial court held that regardless of whether the credit report was accessed, Patty had a permissible purpose to access the report because she was a potential creditor of Sharon as a result of her marriage to Donovan Burke. Further, the trial court found that Jill had a permissible purpose to access the report for a possible extension of credit to Sharon by CFIC. Sharon timely appealed, raising five assignments of error.

{¶ 15} On September 11, 2007, less than one week before oral argument in this case, Jill filed a motion with this court to dismiss the appeal and entry granting summary judgment on the basis that the settlement agreement between Sharon and CFIC also released her because she was an employee or agent of CFIC.

## STANDARD OF REVIEW

{¶ 16} Our review of a trial court's ruling on a motion for summary judgment is de novo. *Broadnax v. Greene Credit Serv.* (1997), 118 Ohio App.3d 881, 887, 694 N.E.2d 167. In reviewing a summary judgment, an appellate court must apply the standard found in Civ.R. 56. According to Civ.R. 56, a trial court should grant summary judgment only when (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor. *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 66, 8 O.O.3d 73, 375 N.E.2d 46. In the interest of convenience, we will address Sharon's assignments of error out of order.

{¶ 17} Assignment of Error No. 1:

{¶ 18} "The court erred when it ruled that defendant, Patty, did not violate the Fair Credit Reporting Act (FCRA) because she had a permissible purpose to access plaintiff's credit."

{¶ 19} Assignment of Error No. 3:

{¶ 20} "The trial court erred when it ruled that defendant, Jill Woodyard, did not violate the Fair Credit Reporting Act (FCRA) because she had two permissible purposes despite her testimony she accessed the credit by accident."

{¶ 21} As the trial court noted in its decision, the gravamen of Sharon's complaint is that appellees worked together to fraudulently obtain her credit report. In her first assignment of error, Sharon argues that the trial court erred in finding that Patty had a permissible purpose to access the credit report. Similarly, in her third assignment of error, Sharon argues that the trial court erred in finding that Jill also had a permissible purpose. Sharon notes that Patty testified in her deposition that she never took steps to access Sharon's credit nor did she see it. Similarly, Sharon cites Jill's testimony that she accidentally accessed the report based on a lead sheet submitted by Patty. As a result, Sharon argues that the trial court ignored appellees' testimony because the legal theory used by the trial court to resolve the case is not supported by the record. Further, Sharon disputes the trial court's finding that Patty is a creditor of Sharon by virtue of her marriage to Donovan Burke. Since Sharon's first and third assignments of error factually interrelate, we will consolidate them into single discussion.

{¶ 22} The Fair Credit Reporting Act ("FCRA"), codified at Section 1681 et seq., Title 15, U.S.Code, was enacted to protect "consumers from inaccurate information in consumer reports and at the establishment of credit reporting procedures that utilize correct, relevant, and up-to-date information in a confidential and responsible manner." *Jones v. Federated Financial Res. Corp.* (C.A.6, 1998), 144 F.3d 961, 965. While the FCRA's primary purpose is to regulate consumer-credit reporting agencies, it also covers the conduct of individuals requesting credit information. *Pappas v. Calumet City* (N.D.Ill.1998), 9 F.Supp.2d 943, 946.

{¶ 23} Section 1681n(b), Title 15, U.S.Code provides civil liability against "[a]ny person who obtains a consumer report from a consumer reporting agency under false pretenses or knowingly without a permissible purpose." Accordingly, the necessary inquiries are (1) whether the user had a permissible purpose enumerated in Section 1681b, Title 15, U.S.Code and (2) whether the information was obtained under false pretenses. If the report is obtained under false pretenses and is not for a permissible purpose under Section 1681b, then liability attaches.

{¶ 24} However, the showing of a permissible purpose to obtain a credit report is an absolute defense to a claim that a person obtained a credit report under false pretenses or knowingly without a permissible purpose. *Edge v. Professional Claims Bur., Inc.* (E.D.N.Y.1999) 64 F.Supp.2d 115, 117. Further, misrepresentation is nonactionable if the FCRA would permit the requesting party to receive a credit report for an unstated but permissible purpose. Id.

{¶ 25} Section 1681b, Title 15, U.S.Code lists the permissible purposes for obtaining a credit report. Further, Section 1681b(f), Title 15, U.S.Code states, "A person shall not use or obtain a consumer report for any purpose unless[:] (1) the consumer report is obtained for a purpose for which the consumer report is authorized to be furnished under this section; and (2) the purpose is certified in accordance with [S]ection 1681e of this title by a prospective user of the report through a general or specific certification."

{¶ 26} In this case, the trial court held that appellees had a permissible purpose to obtain Sharon's credit report and as a result no inquiry was necessary to determine whether it was obtained under false pretenses. In making this decision, the trial court relied on *Marzluff v. Verizon Wireless,* 151 Ohio App.3d 733, 2003-Ohio-913, 785 N.E.2d 805. In *Marzluff,* following dissolution of the parties' marriage, Karen Wiegand and Steve Marzluff entered into an oral agreement in which Wiegand agreed to transfer her interest in the marital property to Marzluff. In exchange, Marzluff agreed to pay Wiegand $6,000 and refinance the mortgage on the residence with Marzluff as the sole debtor. Id. at ¶ 5. Marzluff never refinanced the property. Id. Six years later, Wiegand discovered that she remained indebted on the mortgage when she applied for a mortgage loan on a new residence. Id. at ¶ 7. As a result, Wiegand, who was employed as a senior business-account executive for Verizon Wireless, accessed Marzluff's credit scores via Verizon's computer network to determine whether he could have refinanced the mortgage. Id. Marzluff learned that his credit had been accessed when he received a computer-generated letter from Verizon referring to his "application for cellular telephone service." Id. at ¶ 8.

{¶ 27} Marzluff filed suit against Wiegand and Verizon, alleging violations of the FCRA. The trial court determined that Wiegand had a permissible purpose for accessing Marzluff's credit report and granted summary judgment to Wiegand. Id. at ¶ 9. On appeal, the Second District Court of Appeals agreed with the conclusions of the trial court, holding that "the material relationship between Marzluff and Wiegand was one of debtor and creditor" because the parties had entered into an agreement to refinance the mortgage. Id. at ¶ 16, 21. As a result, Wiegand had a reasonable belief that Marzluff owed her a debt and had a permissible purpose under the FCRA to inquire into Marzluff's credit. Id. at ¶ 22.

{¶ 28} Similarly, in this case, the trial court found that "[Sharon] Hall was ordered to refinance the marital residence she shared with [Donovan] Burke as part of their divorce decree." In a footnote, the trial court acknowledged that "this key fact is the cornerstone" of appellees' argument.

{¶ 29} As a result, the trial court held that "[i]f Patty Burke actually accessed and used Hall's credit report, it was only in the context of gathering information about refinancing the marital home. Patty Burke reasonably believed that she was a creditor to Hall by virtue of her marriage to Donovan Burke. Thus, she had a permissible purpose to access Hall's credit report. Since Patty Burke had a permissible purpose to access Hall's credit, as a matter of law she could not have obtained the information under false pretenses." Further, the court held, "Because Patty Burke had a permissible purpose for accessing Hall's credit, then too Woodyard would have had a permissible purpose for accessing the credit."

{¶ 30} A review of the record demonstrates that the trial court's cornerstone assumption of fact is erroneous. In examining the divorce decree, we find no support for the trial court's finding that Sharon has been "ordered to refinance the marital residence." Rather, the divorce decree specifically states, "Plaintiff [Sharon] shall retain the residence located at 323 Park Avenue, Hamilton, Ohio 45013, free and clear of any interest in defendant [Donovan Burke], and she shall assume any outstanding mortgage(s) on said real estate, holding the defendant harmless from any payment thereon."

{¶ 31} The divorce decree requires Sharon only to assume the outstanding mortgage and hold Donovan Burke harmless from any further payments. Nowhere in the divorce decree, or the record, do we find any evidence that Sharon was required or ordered to refinance the marital residence; nor is there any evidence that Donovan Burke is a judgment creditor of Sharon. We also disagree with the trial court's finding that simply by virtue of her marriage to Donovan Burke, Patty is automatically a creditor of Sharon and as a result may permissibly access Sharon's credit. Accordingly, the trial court's foundational assumption, and its subsequent reliance on *Marzluff*, is incorrect. Further, without this foundational assumption, appellees' arguments in these assignments of error begin to unravel when viewed in light of the submitted evidence.

{¶ 32} We also find no factual support for the assumption that Patty was entitled to inquire into appellant's credit because she could reasonably believe that she was a creditor of Sharon. Patty denied seeking access to Sharon's credit report and testified that she never received any information regarding Sharon's credit. Jill, however, stated in her deposition that she mistakenly inquired into Sharon's credit after receiving a lead sheet, which she believed was submitted to CFIC by Patty. Appellees' accounts contain inconsistencies. Further, the

affidavits submitted by Sharon suggest that appellees may have accessed Sharon's credit report under false pretenses.

{¶ 33} After reviewing the evidence, we disagree with the trial court's assumptions of fact in this case. Having granted summary judgment to appellees on the basis of permissible purpose, the trial court ignored Sharon's affidavits that when viewed in the light most favorable to Sharon, contradict appellees' inconsistent portrayals of the events. Based on our foregoing analysis, we find that a genuine issue of material fact exists whether a permissible purpose existed for appellees to access Sharon's credit report and whether appellees accessed Sharon's credit report under false pretenses. See *Thibodeaux v. Rupers* (S.D.Ohio, 2001), 196 F.Supp.2d 585.

{¶ 34} Appellees urge in their briefs, however, that regardless of Sharon's allegations or whether a genuine issue of material fact exists, Sharon has presented no evidence of any actual damages. Specifically, appellees direct this court to consider Sharon's deposition testimony that her credit score improved after being accessed by Jill. Similarly, in its decision, the trial court found that "by her own testimony, [Sharon] Hall was not *harmed* by Woodyard's credit inquiry. In fact, her credit score actually *improved* in the time following the inquiry." (Emphasis sic.)

{¶ 35} We acknowledge appellees' argument. However, it has no merit. Section 1681n(a)(1)(B), Title 15, U.S.Code, provides for statutory damages regardless of whether any actual damages are proven. That section states, "[I]n the case of liability of a natural person for obtaining a consumer report under false pretenses or knowingly without a permissible purpose, actual damages sustained by the consumer as a result of the failure or $1,000, whichever is greater." Further, 1681n(a)(2) authorizes punitive damages to be awarded and 1681n(a)(3) allows for an award of attorney's fees. Accordingly, if Sharon proves a violation, she is entitled, at the very least, to a statutory damage award of $1,000, and possibly to punitive damages and an award of attorney fees.

{¶ 36} Sharon's first and third assignments of error are sustained.

{¶ 37} Assignment of Error No. 4:

{¶ 38} "The trial court erred when it dismissed the plaintiff's claims based upon Ohio's Little RICCO [sic] law, R.C. 2923.34."

{¶ 39} In her fourth assignment of error, Sharon argues that the trial court erred by dismissing her civil claim under Ohio's RICO law. Specifically, Sharon argues that appellees engaged in a pattern of corrupt activity by fraudulently accessing her and Sharon Lawrence's credit reports and creating a phony lead sheet. Sharon argues that appellees committed perjury by creating

the phony lead sheet. In addition, Sharon makes further accusations that these actions are part of a grand scheme to take her daughters away from her. Sharon claims that Patty fabricated a child-molestation claim against her husband, when Patty actually molested the child. Further, Sharon argues that Patty committed perjury during Sharon's divorce hearing. Sharon argues that all of these incidents are related to a single pattern of corrupt activity involving appellees.

{¶ 40} R.C. 2923.32(A) makes it unlawful for any person employed by or associated with any enterprise to "conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity or the collection of an unlawful debt."

{¶ 41} R.C. 2923.34(B) permits an individual who is injured or threatened with injury by conduct under R.C. 2923.32 to bring a civil action.

{¶ 42} To prevail on a civil action based on R.C. 2923.34, a plaintiff must prove by a preponderance of the evidence (1) that the conduct of the defendant involves the commission of two or more specifically prohibited state or federal criminal offenses, (2) that the prohibited criminal conduct of the defendant constitutes a pattern of corrupt activity, and (3) that the defendant has participated in the affairs of an enterprise or has acquired and maintained an interest in or control of an enterprise that exists separate and apart from the defendant. R.C. 2923.34(B); *U.S. Demolition & Contracting, Inc. v. O'Rourke Constr. Co.* (1994), 94 Ohio App.3d 75, 83, 640 N.E.2d 235.

{¶ 43} R.C. 2923.31(I) defines "corrupt activity" and lists the offenses that constitute corrupt activity.

{¶ 44} In its decision, the trial court noted that Sharon does not indicate which enumerated crimes she believes appellees committed. Rather, the trial court stated that Sharon only makes the generalized accusations that appellees violated the FCRA, committed perjury, and manufactured evidence. Similarly, in this appeal, Sharon makes the same generalized accusations, failing to identify any specific violations.

{¶ 45} As a preliminary matter, we note that a violation of the FCRA is not a predicate offense included in the definition of "corrupt activity." Further, there is no evidence that Jill engaged in any activity other than the incidents involving Sharon's credit report and was not connected in any way with a scheme involving Sharon's daughter. Further, Sharon has presented no evidence that the credit check relates in any way to the claim that Patty attempted to take her daughter.

{¶ 46} Sharon's fourth assignment of error is overruled.

{¶ 47} Assignment of Error No. 5:

{¶ 48} "The trial court erred when it found there was no invasion of privacy when both defendants testified they had no permissible purpose and there was no court order to refinance."

{¶ 49} Sharon argues in her fifth assignment of error that the trial court erred by failing to find a genuine issue of material fact for her invasion-of-privacy claim.

{¶ 50} The tort of invasion of privacy consists of four distinct components: (1) intrusion into the plaintiff's seclusion, solitude, or public affairs; (2) public disclosure of embarrassing private facts about the plaintiff; (3) publicity that places the plaintiff in a false light; and (4) appropriation of the plaintiff's name or likeness for the defendant's advantage. *Housh v. Peth* (1956), 165 Ohio St. 35, 133 N.E.2d 340, paragraph two of the syllabus.

{¶ 51} The trial court in this case duly noted in its decision that Sharon "never articulated which theory of invasion of privacy entitles her to damages." As a result, the trial court compared the facts of the case with the elements for each component, finding that Sharon has failed to show that any genuine issue of material fact exists for any of the components. Similarly, in her appellate brief, Sharon again fails to identify which cause of action she relies upon. Rather, Sharon simply repeats the general allegations included in her previous assignments of error.

{¶ 52} Accordingly, Sharon's fifth assignment of error is overruled.

{¶ 53} Assignment of Error No. 2:

{¶ 54} "The trial court erred when it failed to rule upon the plaintiff's motion to amend the complaint to include negligent access."

{¶ 55} In her second assignment of error, Sharon argues that the trial court erred by failing to rule upon her motion to amend the complaint. Sharon claims that the "court erred in not granting this motion since the defendant Patty Burke manufactured a sexual abuse claim against the plaintiff's husband as part of her goal to get the plaintiff's daughters removed. The court erred in not allowing the plaintiff to amend to add negligence when defendant Jill Woodyard testified she accessed the plaintiff's credit 'by accident.'" Sharon argues that since leave of court to amend a complaint is to be freely given, the court abused its discretion in not ruling on the complaint.

{¶ 56} Jill filed a motion for summary judgment on April 10, 2006. Sharon then filed her motion for leave to amend her complaint on May 4, 2006. Further, on May 8, 2006, Patty filed her motion for summary judgment. Thereafter, on November 3, 2006, Sharon filed a motion requesting a decision on all motions for summary judgment.

{¶ 57} In her motion, Sharon only requested a decision on the pending summary-judgment motions, which the trial court ruled upon. As a result, we find no abuse by the trial court in failing to rule upon Sharon's motion to amend her complaint.

{¶ 58} Sharon's second assignment of error is overruled.

## MOTION TO DISMISS

{¶ 59} In addition to Sharon's assignments of error, Jill has filed a motion to dismiss with this court arguing that the settlement agreement between CFIC and Sharon includes Jill because she is an employee or agent of CFIC. Jill argues that the settlement agreement renders the appeal moot as against her.

{¶ 60} The settlement agreement was entered into in December 2006, and Jill admits receiving a copy of the agreement on January 11, 2007, while her motion for summary judgment was still pending with the trial court. However, Jill never filed a motion to dismiss with the trial court. Further, Jill filed a brief in the instant appeal, mentioning nothing about being a potential party to the settlement agreement, and did not file the motion to dismiss until September 11, 2007, less than one week before oral argument was held for the instant appeal on September 17, 2007.

{¶ 61} In light of Jill's failure to raise this issue while the case remained pending in the trial court and our remand of the case at bar, we overrule Jill's motion to dismiss.

{¶ 62} The judgment is affirmed in part and reversed in part, and the cause is remanded with further proceedings consistent with this opinion.

Judgment is affirmed in part
and reversed in part,
and cause remanded.

WALSH and POWELL, JJ., concur.